**RUTTER et al. v. NORMAN et al.**

No. 17042.

Court of Appeal of Louisiana. Orleans.

June 12, 1939.

Michel Musson and H. W. Robinson, both of New Orleans, for appellants.

C. E. Hardin, of Lake Charles, for appellee L. A. Norman.

Gordon Boswell, of New Orleans, for appellee American Surety Co.

JANVIER, Judge.

Plaintiffs, all of age, are the only children of Mrs. Caroline Lais Rutter, who died as the result of injuries sustained at about 7:30 o'clock on the night of February 1, 1937, at the corner of St. Charles and Gravier Streets, when she, crossing St. Charles Street on foot, came into contact with an automobile owned by Leslie A. Norman and being driven by him up St. Charles Street.

Defendants are Leslie A. Norman, owner and driver of the car, and American Surety Company of New York, his liability insurance carrier.

Plaintiffs aver that the accident resulted solely from the negligence of Norman in operating his car at excessive speed, in failing to have his car under control in approaching the intersection of Gravier Street, and particularly in failing to avoid petitioners' mother, which, it is charged, he had an opportunity to do.

Defendants deny that there was any negligence in Norman and aver that the sole cause of the accident was the carelessness of Mrs. Rutter in suddenly walking out into the street and into the side of the Norman car, and, alternatively, in the event that Norman was in any way negligent, defendants aver that the contributory negligence of Mrs. Rutter was the proximate cause of the accident and prevents recovery by plaintiffs.

There was a trial by jury which resulted in a verdict for defendants by a vote of 9 to 3. From a judgment based on this verdict, plaintiffs have appealed.

St. Charles and Gravier Streets, both in the principal commercial section of New Orleans, are paved, and each is what is known as a "one-way" street, St. Charles being reserved to traffic moving in the uptown direction and Gravier to that moving towards the Mississippi River. Gravier Street, at that intersection, is shown to have a curb-to-curb width of slightly more than 22 feet 2 inches and St. Charles Street, measured in the same manner, is shown to be 40 feet wide. On both streets there are the usual sidewalks. On St. Charles Street there are two street car tracks and, according to the map which we find in evidence, the one on the lake side of the street, which is used for street cars proceeding in an uptown direction, is, by a foot or so, nearer to that curb than the other track is to the curb on the other side.

The night on which the accident occurred is shown to have been cold and blustery. Mrs. Rutter had crossed Gravier Street in a downtown direction on the lake side of St. Charles Street and had then turned to her right towards the Mississippi River and had stepped from the curb to cross St. Charles Street, from what is called the St. Charles Hotel corner, to the Whitney Bank corner. The impact between her body and the Norman car occurred near the lower edge of the pedestrian lane in which she was crossing and at a point variously estimated at somewhere between 8 or 10 feet from the sidewalk and the middle of St. Charles Street, which is shown to be 20 feet from the sidewalk.

█ It must be conceded that there was negligence on the part of Mrs. Rutter in walking out into the street and directly into the side of the passing car, as some of the witnesses say she did, or directly into its path, as others testify. Either she saw the automobile and should not have placed herself in danger, or, if she did not see it, she was negligent in this regard.

In Rottman v. Beverly, 183 La. 947, 165 So. 153, 158, which involved injuries to a Mrs. Rottman, who was walking across a public road, the Supreme Court, under somewhat similar circumstances, referring to the injured plaintiff, said: "She * * * was * * * guilty of the grossest kind of negligence."

But that Mrs. Rutter was negligent is not the sole, or the ultimate determining factor, in reaching a conclusion as to the legal cause of the accident, and, therefore, assuming that there was negligence on the part of Mrs. Rutter, we consider the evidence concerning the actions of Norman.

█ We deem it extremely important to determine definitely the exact point at which he might have discovered Mrs. Rutter and realized her peril because, even if her peril was brought about by her own careless inattention, if it is shown that, after Norman, had he been attentive, should have realized that she was in danger and did not herself realize it, there yet remained to him time to avoid the calamity which ultimately befell, he would be responsible under the doctrine announced in Jackson v. Cook, 189 La. 860, 181 So. 195.

It is important to determine the speed at which Mrs. Rutter walked while in the street, just how far she walked after leav-

ing the sidewalk, the speed of Norman's car as it approached, and whether there was any obstruction to Norman's view which prevented his seeing Mrs. Rutter during any portion of the distance traversed by her after stepping from the sidewalk.

Most of the witnesses think that she was walking at an ordinary pace, though Hubbs, a witness for plaintiffs, after saying that "she was just walking at an average gait", added: "She was walking at a pretty fair rate of speed". Mr. Ayers, guest passenger of Norman, says that "she was walking hurriedly". As it is shown to have been a cold and windy night, it is quite probable that the phrase "pretty fair rate" is reasonably accurate.

In Rottman v. Beverly, supra, the Supreme Court assumed that the injured woman had been walking across the road at a rate of 4 miles per hour and said that she traversed approximately 6 feet per second. Assuming, here, that Mrs. Rutter, who, because of the weather, had reason to hurry, was walking at that speed, she, too, would have covered about 6 feet in each second after leaving the sidewalk.

Concerning the speed of the Norman car there is a disagreement among the witnesses. Mr. Songy, a witness for plaintiffs, who was seated in his taxicab—parked along the St. Charles Street curb—fixed Mr. Norman's speed at 35 miles per hour, "or maybe a little better". Mr. Hubbs, also a witness for plaintiffs, who was standing on the corner near the spot at which Mrs. Rutter stepped from the curb, estimated the speed at 40 miles per hour. Mr. Gosserand, another witness for plaintiffs, states that he did not see the accident until just after the crash, but that, when he looked up, the automobile was still moving. As to its speed he says: "I should judge something between 30 and 35 miles an hour, probably around 30; that is indefinite".

On behalf of defendants, Mr. Ayers, the guest passenger, fixed the speed at less than 25 miles per hour, stating that he was very nervous when riding in automobiles and that, in commercial centers, a speed of more than 25 miles would frighten him and that on that occasion he was not the least bit in fear.

Mr. Norman said that the car was moving at "probably" 20 miles per hour and that he is certain his speed was slow because he had practically stopped in front of the St. Charles Hotel and because he intended to stop at the Masonic Temple Building, only two very short blocks away, in order to allow Mr. Ayers to alight.

We shall not, at this point, comment further on the speed of the car except to say that the city traffic ordinance, No. 13,702 C. C.S., in Article V, Section 3, sub-paragraph (b), fixes the maximum speed at such corners at 15 miles per hour. Apparently, then, Mr. Norman was, to some extent, guilty of violating that provision of the ordinance.

The next and most important question to be considered is whether Mrs. Rutter had walked any considerable distance into the street after stepping from the curb. Songy says that she had reached the center of St. Charles Street. This would place her 20 feet from the sidewalk. At four miles per hour, it would have required a little over three seconds for her to have reached that point.

Gosserand says that, after she was struck, she was picked up a little on the lake side of the center of St. Charles Street, but he admits that he was more interested in helping Mrs. Rutter than in determining details concerning the occurrence. These are the only two witnesses who say that she had walked as far as the center of St. Charles Street.

Hubbs states that she was struck just as she stepped over the first street car rail and he estimates that rail as being: "I would say probably 10 or 12 feet, or 10 or 11 feet from the sidewalk".

If that rail was 12 feet from the sidewalk, then, at four miles per hour, Mrs. Rutter would have reached it in two seconds.

Mr. Norman says that his car was proceeding up St. Charles Street four feet outside the line of cars parked along the curb. If this is true, then, since Mrs. Rutter came into contact with the right side of the car, she had walked a distance representing only the width of the parked cars and this additional 4 feet, or possibly 9 or 10 feet from the sidewalk.

Mr. Stowell, a witness for defendants, was standing in St. Charles Street, near the corner of Union, and was looking down St. Charles Street because he was expecting his wife to arrive in his car. He saw the Norman car and says that, as it was coming up St. Charles Street, he saw Mrs. Rutter walk out from the sidewalk and directly into the car, and he fixed the spot at which she fell at a point marked by him on the map, which is shown to be some 7 or 8 feet from the curb, from which she had stepped into the street. He also testified

that "* * * this human figure stepped off the banquette right in front of a parked automobile, and just as she got to the outside or left side of that parked automobile, the Norman car was coming up, and they came in contact right at that point".

This is practically all of the evidence as to the distance Mrs. Rutter had traversed after leaving the sidewalk and we feel that, by a substantial preponderance, it shows that she had walked not more than 10 or 12 feet, and possibly not that far, when the Norman car reached her, so that she had been in the street certainly not more than about two seconds.

There is another factual question on which there is some dispute. It concerns the location of the taxicab of Songy with reference to the spot at which Mrs. Rutter stepped from the curb. This car was parked alongside the curb in front of the St. Charles Hotel and near to the Gravier Street intersection. Just how near, it is of importance to determine, for, if it was close to the point at which she stepped from the curb, then, as she was walking in front of that car, it obstructed the view of her in the direction from which Mr. Norman was approaching. Mr. Songy says that his car was 30 feet from the corner and he shows plainly that he means 30 feet from the Gravier Street curb line and not 30 feet from the place at which Mrs. Rutter stepped into the curb, for he stated that, when she stepped into the curb, she was 20, or possibly 25, feet in front of his cab, and the evidence shows that she was crossing the street very near to the lower edge of the pedestrian pathway, which was marked with a white line.

Plaintiffs' other witness, Hubbs, who attempted to estimate the distance between Mrs. Rutter and the front of the parked taxicab, fixes it at 15 or 20 feet, while defendants' witnesses are all of the opinion that the taxicab was very close to the pedestrian lane. Stowell was of the opinion that its front was practically at the white line marking that lane.

We conclude that the weight of the evidence is to the effect that the taxicab was only a few feet from the lower side of the pedestrian lane and that, consequently, when Mrs. Rutter stepped from the curb, she was screened from the view of Mr. Norman by the taxicab and remained so screened until she had reached a point 5 or 6 feet in the street, and that there thus remained of the total distance crossed by her, only about 4 or 5, or possibly 6 feet, which, at 4 miles per hour, she would have traversed in about one second.

The evidence, by a substantial preponderance, shows that Mrs. Rutter was not struck by the front of the Norman car, but walked into it either on its right side, or at the extreme right end of the front bumper.

Mr. Ayers, who was seated on the right side of the front seat, is very positive that "* * * she was approaching the side of the car from the right, a distance away from the hood sufficient that when I hollered 'watch out', she struck the car about where my shoulder was, and I was to the right of the driver; * * *".

Mr. Hubbs, to whom we have already referred as a witness for plaintiffs, says that she hit the right side of the car, and, when asked "What part of the Norman car struck this lady?", said:

"A. Well, the front fender and the bumper, in other words, I would say probably 12 or 13, maybe 15 inches off the side of the car, in other words, if this is the side of the car (indicating) I would say about a foot or maybe a foot and a half.

"Q. On the right hand side? A. On the right hand side."

Mr. Songy, the witness principally relied upon by plaintiffs, said that "the side of the front of the fender hit the lady * * *" and that Mrs. Rutter was "not directly in front at no time".

Stowell said that "the point of contact was the side of the machine, but the machine was facing directly toward me and so whether she came in contact with the forward part of the front fender or the back part of the front fender or the middle of the machine, I could not tell from my position, but it was the side of the machine".

It is true that Mooty, a witness for plaintiffs—whose testimony is, in many instances, obviously inaccurate—insists that she was hit by the front fender and that there remained as evidence a dent in that fender.

But it is certain that this dent existed only in Mooty's imagination. Not only do Norman and Stowell state positively that there was no such dent, but Henry Werner, an official inspector for the Police Department, testified that at 9:30 o'clock on that same night, after Mr. Norman had left his car with the police for a full inspection, he completely examined the car and that it is his duty to examine automobiles which have

been involved in accidents to ascertain just what parts have been injured and to attempt to determine from this how each accident occurred. He states that, in spite of the fact that, for these reasons, he was looking for dents or marks on the car, he found absolutely none on Mr. Norman's. It is evident that, since the car was a very new one, any dent would have been noticeable.

Mr. Norman concedes that, as he approached the corner, he did not sound his horn, but adds: "I didn't see anything to blow for", and, since the record conclusively shows that Mrs. Rutter stepped into the street when screened by the parked taxicab, was dressed in dark clothes, and walked rather rapidly into the side of Mr. Norman's car, we can easily understand why he did not see her and we quite agree that there was no reason for the sounding of his horn under those circumstances. Norman also concedes that, had there been anything to indicate that a pedestrian was about to cross, he would have been required to yield the right of way to such pedestrian, for he, referring to pedestrians, says: "They always have the right of way, regardless of ordinance, if you see them, that's my opinion."

There is an intimation in the record that, after the accident had occurred, Mr. Norman did not bring his car to a stop as soon as he might have and that his failure to do so indicated an intention to escape and to avoid the consequences which might otherwise be visited upon him.

The record abundantly disproves this charge and shows that Mr. Norman stopped at the curb as soon as it was reasonably possible for him to do so. In fact, Mr. Songy, the witness who intimates that Mr. Norman may have intended to escape, testifies that, as a matter of fact, he parked his car before it reached the next corner; that he parked it on St. Charles Street on "the downtown side of Union Street", and he also said that the block between Union and St. Charles Streets "is one of those short blocks". In another part of his testimony Mr. Songy admitted what all of the other witnesses testified without equivocation—that Mr. Norman at once returned to the scene of the accident, expressed great regret, and offered to do anything he could to help. Mr. Songy stated that Mr. Norman "said he was awfully sorry it had happened and he wouldn't take a million dollars to do anything like that and he would do all he could to take care of the lady".

We find, then, no negligence in Norman in any of the particulars charged, unless it be in that, to some extent, he exceeded the speed limit fixed in the ordinance. That excess, if any, was, we think, very slight. But, if there was such a technical violation, it did not form a causative factor.

In Jones v. American Mut. Liability Ins. Co., 189 So. 169, 171, decided May 22, 1939 and not yet reported [in State Reports], we said: "* * * Should we accept the higher estimate (35 miles per hour) and presume that Ferguson was guilty of a slight infraction of the ordinance, we cannot perceive that his speed had any causal connection with the accident. In other words, it is patent that it does not make the slightest difference whether the automobile was traveling 30 or 35 miles per hour, as Jones would have been struck in either event. In truth, the underlying and proximate cause of the accident was the deceased's imprudence in leaving the safety afforded by the neutral ground and stepping into the roadway in front of the moving car."

In Hudson v. Jackson Brewing Company, 4 La.App. 549, we, in discussing the effect on liability of speed slightly in excess of the legal limit, said: "* * * This excess of speed, however, is not sufficient to charge plaintiff with recklessness, and, moreover, it is only of consequence, if it contributed to the accident."

See, also, Belden v. Roberts, 3 La.App. 338, and Aetna Casualty Company v. Lee, 10 La.App. 763, 123 So. 137, 138, in the latter of which we said: "* * * it does not appear to us that the speed at which the Kennedy car was being driven was a contributing factor to the accident. It should be remembered that his car was run into from the side by the Lee car, and we do not believe that the fact that the Kennedy car was going 25 miles per hour instead of 15 had any causal connection with the subsequent happening."

If Mrs. Rutter stepped out from obscurity and from a position of safety and walked headlong into the side of the passing car, what mattered it that the car may have been running at 25 or 30 miles per hour, instead of at the 15 required by the ordinance.

The case is vastly different from that presented by Rottman v. Beverly, supra, for there Mrs. Rottman was on the highway and there was nothing to obstruct the view of the motorist, who saw her walking for 20 feet across the road on which his car was approaching and should have seen that she

did not realize the peril in which she was involved.

Nor does this case present facts similar to those found in Jackson v. Cook, supra, for there the pedestrian was in plain view of the approaching motorist and indicated, by his actions, that he was under the influence of liquor to such an extent as to be incapable of exercising caution. All that the court said there was that, had the motorist been exercising due care, he would have noticed Jackson, would have realized his condition and could have stopped the automobile.

This case presents facts much more similar to those which we considered in Jones v. American Mutual Liability Insurance Company, supra.

■ Most important of all, we find that, under the disputed facts, a jury has found in favor of the defendants and has thus resolved those important questions of fact in favor of the contention of the defendants. We find ourselves unable to conclude that there is manifest error in the conclusion reached below.

It is therefore ordered, adjudged and decreed, that the judgment appealed from be and it is affirmed at the cost of plaintiffs.

Affirmed.

WESTERFIELD, Judge (dissenting).

In my opinion Mrs. Rutter was in plain view of Norman at a time when he could or should have avoided striking her. The locality where the accident occurred was well lighted by street lamps and also by decorative electric signs on the business establishments located there. There is some difference in the testimony of the witnesses concerning the point where Mrs. Rutter was when struck by the Norman automobile and also a conflict in the evidence as to whether the parked taxicab interfered with the vision of Norman. The speed of the Norman car is also in doubt. However, my appreciation of the testimony is that Mrs. Rutter was far enough out into the intersection to be visible, and that Norman had a clear view and was guilty of excessive speed. A speed of more than fifteen miles per hour in that locality is prohibited. See Section 3, Article V, Paragraph (a). Mrs. Rutter also had the right of way. Article IV, paragraph 2 of the Traffic Ordinance, No. 13,702 C.C.S. reads as follows: "The operator of any vehicle shall yield the right of way to a pedestrian crossing the roadway within any marked cross-walk, or within any unmarked cross-walk at an intersection, provided the pedestrian has started across the street before the vehicle has entered the intersection, except at intersections where the movement of traffic is being regulated by police officers * * *".

In Rottman v. Beverly, 183 La. 947, 165 So. 153, 155, it was said:

"It is frequently stated by courts that there can be no recovery in negligence cases 'where it appears that the negligence of the plaintiff continued until the moment of the accident,' but that is not a correct statement of the rule. Thus broadly stated, it is misleading, for it is not true in a strict legal sense that a plaintiff is barred from recovery under any and all circumstances merely because he was guilty of negligence which continued down to the moment of the accident which caused his injury, and this court has never so held.

*    *    *    *    *    *    *

"In those cases [where negligent plaintiff was not allowed to recover against negligent defendant] the fault of each operated directly to cause the injury. The defendants had no better 'last chance' to avert the accident than did the pedestrians, and inasmuch as the pedestrians could have avoided the injuries by taking proper precautions, and failed to do so, and as their negligence continued down to the accident, they were in no position to invoke in their behalf the doctrine of last clear chance.

"But in those cases if the engineers and others in charge of the engines or trains had actually discovered the peril in which the pedestrians had negligently placed and kept themselves, and after discovering the danger had negligently failed to use such reasonable and available precautions as would, if exercised, have saved the pedestrians from the consequences of their negligence, the plaintiffs might have been entitled to a verdict. This is upon the well-recognized principle that it is the duty of those in control of dangerous instrumentalities to avoid accidents and injuries to others if they reasonably can, even though the party in danger may have negligently placed and kept himself in a position of peril of which he was unaware."

It will be noticed that a greater responsibility rests upon the driver of an automobile than upon a pedestrian upon the ground that the automobile is a dangerous instrumentality.

Jackson v. Cook, 189 La. 861, 181 So. 195, 197, is an affirmation of Rottman v. Bever-

ly, supra, the chief distinction being, as was said in the opinion: "The only difference between the Rottman Case and the case presently before us is this: In the Rottman Case Mrs. Rottman was guilty of gross negligence which continued up to the moment of the accident. Beverly, the driver of the automobile, actually saw her in her perilous position in time to avert the accident had he used proper precautions. In the present case the plaintiff was guilty of gross negligence which continued up to the moment of the accident. The driver of the car did not see, but could have seen, plaintiff in his peril if he had been looking ahead. The mere fact that the driver of the car in this case did not see plaintiff does not absolve the defendant from liability, because it was the duty of the driver to look, and, according to the findings of both courts, he was not looking. The Rottman Case is not authority for holding that, merely because the driver of the car in this case did not actually see the plaintiff, the defendant is not liable."

For the foregoing reasons, I respectfully dissent.